HELMER, Appellant, vs. EQUITABLE RESERVE ASSOCIATION, Respondent.

*January 11—February 6, 1934.*

For the appellant there was a brief by *Fox & Fox* of Chilton, and oral argument by *Leo P. Fox*.

*Benjamin Poss* of Milwaukee, for the respondent.

FAIRCHILD, J.   The contract which determines the rights of the parties was entered into by Louis A. Helmer, November 27, 1905.   It was a benefit insurance contract in the amount of $2,000 with certain limitations and conditions, accepted and continued until the insured was suspended De-

cember 1, 1924, for non-payment of the monthly assessment payable in November of that year. The insured paid no further assessments and died June 23, 1927.

The contract among other provisions contained the following stipulations:

"1. Thirty (30) days is allowed for the payment of assessments after the date of the notice of assessment. If the assessment is not paid within said thirty (30) days, the insured shall stand suspended from the association, and this contract shall become void without further notice.

. . . . . . . . . . .

"3. When said insured shall have paid the sum of one hundred fifty dollars in assessments upon the sum of five hundred dollars, and proportionately on any multiple thereof, for which this contract is issued, or when said insured shall have reached the age of seventy (70) years, he shall thereafter be released from all further assessments on this contract; unless at that time, or thereafter, the experience of the society proves that the reserve fund and assessments on the members as provided for by the laws are insufficient to enable the society to meet its promised insurance obligations in full."

This contract under which appellant seeks to recover is described in the testimony as "Plan One." Its terms are plain and under it the insured paid for his protection currently. It provided for no legal reserve. When the insured ceased paying the assessments properly levied, the association was under no obligation to continue the protection or furnish any benefit whatever. Appellant challenges this proposition and contends that the insured was entitled to extended insurance. This claim on appellant's part is based on another claim that there was an accumulation of a reserve or credit which attached to this policy, and the argument is that this credit applied to that purpose did pay the assessment against the insured to a period beyond the date of his death and that respondent is estopped from claiming there was no reserve for that purpose. In order to establish the point, ap-

pellant must overcome the fact that no provision for extended insurance under a "Plan One Contract" was contained in the agreement or provided for in the by-laws, and must also overcome the fact that the so-called credit is not one belonging in any individual sense to the insured.

The "Plan One Contracts" were valued on what is spoken of as an accumulation basis. This creates very different results from contracts providing for adequate rates valued on what is known as the tabular basis. The many varieties of life insurance contracts can usually be resolved into two general types. One seeks to give protection for a definite limited period without attempting to build up a reserve and may be described as "term insurance." The other type seeks to build up a reserve which will equal the face value of the policy at the end of the insured's life and is called a "level rate, legal reserve, policy." By way of illustration and reasoning by analogy, a term policy is similar in its operation to an ordinary fire insurance policy. The premium charged represents compensation to the insurer for the risk he undertakes of having to pay a much larger amount in case the insured dies within the period specified by the policy, which may be one year, five years, or even more. At the expiration of this period the insured, in order to continue his protection, must renew the contract or take out a new policy, and, since the hazard increases as he grows older, he will have to pay a higher premium. Thus, term insurance over a long period of time consists of a periodical renewal of the contract at an ever-increasing rate. The significant thing about it is that the insured pays no more at any time than is actually necessary to compensate the insurer for the risk which the latter bears.

Premiums on level rate, legal reserve policies, however, are calculated on a different basis. Here, the premium is based on the insured's life expectancy, not on the probability of his dying within a certain limited period. A premium

is charged which will be sufficient to enable the insurer to accumulate a fund which, upon the expiration of the insured's life expectancy, will equal the face value of the policy. In order to protect policyholders and keep the insurer financially sound, the law requires that the insurer actually set up this reserve. This constitutes what is known as "legal reserve." At any given time it represents an amount which, when augmented by the premiums which it is estimated the insured will pay in the future and by the interest accumulations on the fund, will equal the face value of the policy at the time when the insured's life expectancy ends.

The significant thing about legal reserve, level rate insurance is that the premium is based on the average risk to the insurer over the period of the insured's expected life, instead of increasing as the hazard increases, as in the case of term insurance. Consequently, during the earlier years of the policy, the insured pays a premium which exceeds the value of the protection which he receives. In order to compensate the insured for this excess payment, in the event that the policy is terminated the insurer agrees to pay him back a certain stipulated amount, somewhat less than the actual accumulated reserve. This is known as the "cash surrender value." The insured may take it in cash or he may use it to buy either paid-up or extended insurance. For the purposes of this case, it is this distinction between legal reserve insurance and term insurance which is important. In the one case, the insured by paying in excessive premiums has built up a fund which he may use to extend his protection even after he stops paying premiums. In the other case, he has never paid in more than the amount actually necessary to cover the risk taken, and consequently, since no reserve is accumulated in his favor, when he stops paying premiums his protection is at an end.

While Helmer's policy was not, strictly speaking, a term policy, many of the same principles which control term

insurance are equally applicable to it. The premium charged on the policy which Helmer carried was less than half of what would have been required to build up an adequate reserve on the legal reserve basis. It is true that a surplus of $98.35 per thousand dollars of insurance, representing a small fraction of the amount required on the legal reserve basis, appeared to be on hand when the insured was suspended, but there was neither an attempt nor obligation on the part of the insurer to set this up as a legal reserve or to consider it as such. It resulted, no doubt, from the favorable mortality experience of the company during the period when its policyholders were comparatively young, and, in the absence of additional assessments, would have been consumed subsequently if the company had continued to maintain insurance on this basis. The insured never paid in premiums so in excess of the amount actually required as to justify his beneficiary asking now for a return of part of the amount paid, either in cash or in the form of extended insurance.

The valuation on an accumulation basis is regulated by statute and by the by-laws of the association. The statute provides:

"(1) (a) In lieu of the valuation requirements of subsection (22) of this section, any society accepting in its laws the provisions of this section may value its certificates on a basis, herein designated 'accumulation basis,' by crediting each member with the net amount contributed for each year and with interest at approximately the net rate earned, and by charging him with his share of the losses for each year, herein designated 'cost of insurance,' and carrying the balance, if any, to his credit.

"(b) The charge for the cost of insurance may be according to the actual experience of the society applied to a table of mortality recognized by the law of this state, and shall take into consideration the amount at risk during each year, which shall be the amount payable at death less the credit to the member.

. . . . .

"(d) If, after the first valuation, any member's share of losses for any year exceeds his credit including the contribution for the year, the contribution shall be increased to cover his share of the losses.

"(2) Any member may transfer to any plan adopted by the society with net rates on which tabular reserves are maintained, and on such transfer shall be entitled to make such application of his credit as provided in the laws of the society.

"(8) For this purpose (of furnishing statements of credit to members) individual bookkeeping accounts for each member shall not be required and all calculations may be made by actuarial methods.

"(9) Nothing herein contained shall (a) prevent the maintenance of such surplus over and above the credits on the accumulation basis and the reserves on the tabular basis as the society may provide by or pursuant to its laws; (b) nor be construed as giving to the individual member any right or claim to any such reserve or credit other than in manner as expressed in the contract and its laws; (c) nor as making any such reserve or credits a liability in determining the legal solvency of the society." Sec. 208.04 (22m), Stats. (formerly sec. 1959 (22m).

Such valuation made on the accumulation basis covered outstanding certificates originally issued at contribution rates. "Plan One Contracts" were not designed to provide the legal or tabular reserves. The contribution rates were not computed upon standard tables of mortality and rates of interest, and the valuation on the accumulation basis shows the results of past operation up to the date of valuation, but does not indicate whether or not the accumulated surplus or credits together with future contributions will provide for future claims. This method of valuation does not provide a standard of rates and reserves. It simply provides a method of accounting and in the nature of things the credit claimed could have no great stability, for against the credit, if it were to be treated as an asset of an individual,

there would be a charge in favor of a required reserve which would be the amount which should be on hand in order to pay a policy at maturity. The statute referred to recognized the right of members of fraternal societies to continue existing contracts and provided a method of accounting to determine an equitable distribution of costs. Each member under those contracts pays his own way and is required, when the credit is exhausted, to increase his contributions. *Zerbel v. Supreme Assembly,* 199 Wis. 298, 226 N. W. 288.

Appellant appears to insist that the by-laws of the society recognize extended protection and directs attention to that part of sec. 87 of the by-laws which reads:

"Any member failing to pay any assessment within the time prescribed for the payment of the same, shall stand suspended from the order and his benefit contract shall become null and void, subject to the provisions in these laws contained for extended protection."

Subsequent paragraphs of the same section, however, indicate clearly that such extended protection is granted only to holders of contracts other than "Plan One Contracts." When the association issued to the insured as one of its members its benefit certificate, the benefits and conditions contained therein and the laws of the association then in force and thereafter enacted were, by virtue of the express reference thereto in the certificate, made a part of the contract between the parties. When it became apparent that this certificate and others like it provided rates of payment inadequate in themselves to mature the contracts and provide the benefits stipulated for, changes were devised in an effort to move the members onto the basis of a legal reserve insurance. A plan was proposed under which this insured might have changed his insurance contract for an adequate rate contract. It was provided by resolution that any or all of the "Plan One" members might pay the legal rates at attained age upon transfer to adequate rate contracts, and

in doing so and as an inducement to get them to do so, there was extended the privilege of using such credit as was determined by the actuary of the society to exist under the "Plan One Contract," for the purchase of such amount of paid-up insurance as the same would buy. It appears that at the time the insured was suspended, the amount which would have been available for the purchase of paid-up insurance upon a transfer of his insurance to the legal reserve basis was $196.70.

Prior to his suspension in December, 1924, the insured did make application for a transfer from his "Plan One Contract" to a contract designated "Whole-life plan H, level rate, legal reserve contract" for $2,000, and for "paid-up life benefit contract" in the amount of $390.58, that being the paid-up insurance value of his share of the "Plan One" fund apportioned in connection with the exchange of contracts. The respondent agreed to grant such application, but the insured declined to accept the new contracts after they were issued, and neither of the policies was at any time in force. As has been said, the "Plan One Contract," which was the only contract the insured ever accepted, does not contain any provision for extended insurance either in itself or as supplemented by any provision contained in the by-laws. It follows that there exists no fund available for the paying of assessments after the suspension and that the insured was not released from making such payments on his contract. The contract sued upon is the benefit contract under which the respondent was bound to pay upon the death of the insured seventy per cent. of $2,000, plus all assessments paid by the insured under that contract. This contract became void upon the insured's suspension for non-payment.

The appellant relies upon the case of *Noll v. Catholic Order of Foresters*, 197 Wis. 184, 221 N. W. 759, and urges that the contract of insurance in this case as in that was a Wisconsin contract and that the constitution and laws

of the association must be construed in the light of statutory enactments. He claims that the statutes declare the public policy of the state with respect to forfeitures and that they strongly support the views urged by him, and cites the case of *Tyson v. Catholic Order of Foresters,* 208 Wis. 624, 242 N. W. 500. We do not deem it necessary to review all the statutes referred to as affecting fraternal insurance contracts. The by-laws under review in this case are not the same as those considered in the *Noll* and *Tyson Cases.* The decisions in those cases were based upon express orders in by-laws granting extended insurance. There are other facts which distinguish both the *Noll* and the *Tyson Case* from the one at bar. In both those cases the society issued its contracts on the higher tables of rates and these contracts entitled the insured or beneficiary to one or more benefits in the nature of an automatic loan or extended or paid-up insurance. Sec. 208.03 (3), Stats.

We agree with the conclusion reached by the learned trial judge that prior to Helmer's suspension he was not released from payment of further assessments and that by reason of his refusal to pay assessments he forfeited his rights under the contract. Of this he evidently was aware, for in January, 1924, he wrote the respondent saying: "Yours of the 17th at hand. I wish to say that I am well aware of the fact that I am suspended. . . ."

The respondent had begun its business by writing insurance on an accumulation basis of rates. In its effort to shift to a legal reserve basis, it invited Helmer and others who were under the "Plan One Contracts" to take adequate rate contracts, and as an inducement offered them the benefit on such transfer of certain advantages which existed only because of, and were controlled by, the "Plan One Contracts." These advantages or credits would end when those contracts ended. Helmer's contract ended with his suspension and there was no existing credit then in his favor.

*By the Court.*—Judgment affirmed.